of CBD versus the Planet Nine Private Air. Mr. Turpeney? Will Turpeney, your honor, yes. Good to have you with us, sir. Thank you. I may have pleased the court. I represent appellants WeCBD and WeC-Manage. The district court here in its summary judgment order repeatedly took over the jury's fact-finding role, and that's the overarching error that we're here on today. For instance, the court concluded that the legal hemp that was the cargo on this journey was actually illegal marijuana. But to do that, the court had to ignore facts, and we'll talk about those in a second, and it had to ignore federal law. And of course, it should not have acted as the fact-finder in this case at the summary judgment stage in the first place. But the reason why this issue about the court's determination about the legality of the hemp is so important is that the court's determination on that issue permeated the entire opinion and formed the basis for much of the court's decision. For example, the order says plaintiffs have failed to show that there is a genuine dispute as to any material fact regarding the reason the cargo was seized and eventually destroyed because the evidence on the record demonstrates that the cargo was destroyed because it contained illegal marijuana instead of legal industrial hemp. And to reach that conclusion, which, of course, is the final word in that opinion on causation. But that's just what happened, right? Even if it turns out the federal government was wrong and you say they used the wrong test and all of that, and we can get into whether there's evidence of that, but even if they were wrong and they shouldn't have destroyed it, why does that matter for determining whether the Montreal Convention applies? I mean, what happened is they tested it. They thought it was illegal marijuana and so they destroyed it. We just have to deal with those facts as they happened when we're trying to decide whether their claims against Planet Nine are preempted. So there's, in our view, as the briefing points out, there's two potential causes here, okay? There's CBP's destruction of the hemp and there's Planet Nine's mishandling of documentation that was submitted to CBP before what we call the journey. And both of those happen outside of carriage by air. And so the Montreal Convention here never should apply in the first place. And if the Montreal Convention doesn't apply, the proper causation standard is a proximate causation standard. I thought courts had all had, but our court and the Supreme Court have, we've applied proximate causation to the convention too, to the Warsaw Convention and therefore to the Montreal Convention. So you've got proximate cause is, proximate causation is the standard either way, it seems. And that supports our case, Your Honor, because the proximate cause of the destruction here was Planet Nine's mishandling of documentation. And where's the evidence of that, that documentation was in the chain of proximate causation? So there, for example, there's a letter that Seth Johnson, who's a U.S. attorney in Charlotte, wrote to us, to WeCBD, at the time of the journey that indicates that the government took the action that it took because a false general declaration was filed with CBP before the journey. It's undisputed. That's not really what it, we can, I guess, we can just all read that for ourselves and see whether it says that. But is that, is there other evidence you have that the paperwork error is what caused the seizure here? Other than the government indicating and writing that the paperwork error is what caused the seizure, no, I don't have any other evidence of that. That's the paperwork error that says there was no cargo? Well, there's several different errors. So one issue was, before the flight could occur, a document called a general declaration had to be filed, which is a form that lists whether there's passengers and how many passengers and whether there's cargo on the plane. And here, Planet Nine undertook to complete and submit that general declaration. That's undisputed. And on the general declaration, Planet Nine indicated that there would be passengers on the plane, but that there would not be any cargo. Even though it's also undisputed that Planet Nine knew that there would be cargo on the plane because there's photographs, for example, in the joint appendix of Planet Nine pilots helping to load the cargo on the plane. And so when authorities saw the plane on the tarmac, it was nighttime and they could see through the windows of the plane that obviously there were bags and there was cargo inside the plane. And that was inconsistent. So where, that's, this is the question. Where's the evidence that someone looked at this declaration and saw it said, people, no cargo. And then they looked in the windows of the plane and saw cargo, no people, and that that's why the plane was then boarded and the cargo was tested. The correspondence from Seth Johnson. He says that's why it actually, as a historical matter, happened. Or he says there might, there would be authority under federal law to cite you for that violation. I think the letter says that there would be authority under federal law and then attaches photographs, or at least in other government filings, there are photographs attached showing what could be seen through the plane's windows. Right, right. But that doesn't seem to me to be evidence that that's actually what happened. There's no evidence that that's why this happened. Our position, Your Honor, respectfully, would be that that is at least strong circumstantial evidence. And that it's for a jury to figure out whether that is sufficient evidence or not. And that's kind of our complaint here, is we've got a situation, and I'll dive into that in a second once I answer any questions. But we've got a situation here. What would be the issue for the jury? The issue for the jury would be whether Planet Nine was responsible for the destruction of the legal hamper. Who took the photograph? A government agent. All right, and that's in the record? That's in the record, Your Honor. So someone who had the authority to respond to something that would arise or seem to be out of step? Your Honor, I believe that the photograph would have been taken by a CBP or an agent of CBP. And then the connection there would be seeing that there's nothing wrong, I suppose, with seeing cargo being put on the plane. What about the connector there? That's inconsistent with the declaration. What's the evidence that that authority knew that connector? Some of what Russian has asked about it, that connect? I'm just saying circumstantial evidence that it was seen by a person of authority. Right. Your Honor, certainly CBP can search a plane on airport territory for any reason. Here, the very strong circumstantial evidence, including photographs, the information submitted by the government to us early in this case after the search and seizure, is that the reason was because there was a discrepancy between what was in the general declaration and what they saw looking through the plane windows. And the general declaration was given to whom before they landed or before they took off? CBP. That's a form required by CBP. And in similar fashion, there's another item of information required by CBP called the EEI that there's evidence in the record showing that Planet Nine indicated that it would take responsibility for. And that statute show that Planet Nine as the carrier was responsible for submitting before the plane was allowed to be loaded or take off. And that also wasn't submitted by Planet Nine. I thought the evidence was that someone on the ground on the west coast saw plane seats,  being removed from this airplane and bags and bags and bags and bags being loaded onto it and thought that was suspicious and notified the folks in Charlotte. Right? There's evidence of that also, Your Honor. Yeah. Okay. There's no evidence that anyone in Charlotte looked at this piece of paper, these declarations and said, because of this discrepancy, we're going to step in and look at this cargo. Well, I think... I think your client testified that he thought that was a good hypothetical thing that could have happened, but there's no evidence of that. I think from our perspective, Your Honor, it doesn't matter what happened with somebody saw the plane in Oregon being loaded with cargo or somebody saw it in Charlotte. Either way, the authorities were notified and learned about it somehow. It really matters for you whether there's evidence that the paperwork was the problem, right? You're trying to say your claims aren't preempted by the Montreal Convention because the paperwork happened long before carriage-by-air, but the district court said there's no evidence of that and that all the evidence related to a time when the carrier was in charge of the cargo, which triggers the Montreal Convention. Right. And again, we would point to the Seth Johnson letter and other evidence in the record from the government that, respectfully, we think the jury should have been able to look at. But moving on, unless there are questions. It was destroyed because it was marijuana, right? It wasn't marijuana, though. I thought it was tested to be marijuana. So this is the issue that I'm coming to, Your Honor, about the fact that- But they were tested with marijuana. Okay. So the government tested some of the hemp as high for THC and concluded it was marijuana. The evidence in the record- How was it packed? It was packed in cargo bags and- Like trash bags? I think it was mostly in military-looking duffel bags, if I remember correctly. So the government, in testing the hemp, applied what's called the total THC standard. Okay. The federal- The manner of packing? Sorry? Suspicious to the authority? Um, I don't know whether there's any evidence about whether it was suspicious or not, Your Honor. I don't know that it's relevant to C.V.'s testing of the hemp, though. The hemp was seized. It was tested. C.V.P. tested the hemp using the wrong standard. It used the total THC standard. Hemp's not my first cousin of marijuana. It is- I mean, let me back up and try to make one bigger point, okay? This case involves hemp, but it could be- it could be anything. The problem in this case isn't the hemp. The problem in the case is the district court's procedural errors in failing to allow the jury to do what it was supposed to do, okay? And as our briefing points out, the court did not even consider the federal definition of hemp anywhere in its opinion, even though we discussed it thoroughly in our briefing, okay? And the only way that the court was able to ignore the fact that C.V.P. applied the improper test to determine the levels- Sorry, if you're going to say the district court made a factual finding, there has to be conflicting evidence that it decided between. And it looked to me the only evidence in the record was that the government determined it was, in fact, marijuana. And then on J.A.A. 89, the government says the only criteria used for testing was Delta 9 THC levels. So the government said they used the Delta 9 test that you said they should have used. That's not what the tests of J.A.A. 899 through 909 or 908 say. Those tests, Your Honor, use a totality standard. Well, they don't say that. They use the word total. It had a total percentage of whatever. And then the government clarifies that we did the testing with Delta 9. I'm quoting Delta 9 THC levels. So you had to have evidence on the other side for there to have been a factual discrepancy. After the fact, the government indicates that it used a Delta 9 standard, but not in the test results. Those aren't in the... That's not a statement. It's not in the test results. But those things aren't contradictory. The total THC and the Delta 9 test are totally different tests for testing THC and not. Right. And I guess we can move on from this. You seem to think it's really central and I don't think it actually matters at all to this case. But what's your evidence that the government used a totality, used this test? JA 899 through 908. All right. But they don't say they used that test. They just don't say Delta 9 on those pages. And also says total THC. Total THC percentage. And there's Fourth Circuit cases. And then they go on and explain that the test we used to determine total THC was the Delta 9 test. Where? Not on the test. JA 889. I mean, that might be an after the fact document, an after the fact correspondence, Your Honor. But it's not on the actual test. After the fact, there was litigation between the government and Planet Nine. And the government characterized things the way that it did. But the test results say what they say. And a jury should have been able to look at those test results and consider that. And you think that would have changed whether Montreal Convention preemption applies? How? If a jury had considered this question and agreed with you that this was, may not have been illegal marijuana? Well, they're two separate issues, of course. But if the events causing the destruction fall outside of carriage by air, which they did, because they were Planet Nine's deficient submission or non-submission of paperwork to CBP. Well, how does that relate to whether it's illegal drugs? You're saying the outcome could have been different if the jury found out this wasn't illegal drugs. How does that change the preemption question? I mean, with respect, Your Honor, you're conflating several different issues. So as a threshold issue, there's the issue of whether the Montreal Convention applies. The Montreal Convention doesn't apply because the destruction didn't occur during carriage by air. Once you conclude that the Montreal Convention doesn't apply, you get to the issue of negligence. Planet Nine was negligent. It was in transit from Oregon to Switzerland. Right. That's international transportation. Right, but if the court looks at Article 18 and 18.4, what that says is it can come out of carriage by air when it gets taken outside of the airport, which is where the hemp was destroyed. The hemp, indeed, was destroyed in San Francisco, nowhere near the Charlotte Airport. And it was destroyed when it was in custody of CBP, no longer in Planet Nine's custody. And we know that because if the hemp had been destroyed for correspondence from the government, or had not been destroyed for correspondence from the government, the hemp would have been returned back to the appellants. But you can only, you can't hold Planet Nine responsible for what government does. You can only hold Planet Nine responsible  And so you have to be suing for something related to what the government does. How Planet Nine did things. I can hold Planet Nine responsible because Planet Nine's negligence in filling out the paperwork for CBP is the proximate cause of the harm. Well, that's my point, is the question for the Montreal Convention is, did what Planet Nine do, what you're trying to hold them responsible for, did that happen during international carriage by air? No. That's the question, not whether when the government destroyed it months later, you know, the government had charge of the marijuana instead of Planet Nine having charge of it. So again, as we brief in section, argument three, all right, there's a distinction here between direct cause, which is what the Montreal Convention cares about, which is the government actually, I see I'm out of time, Your Honor, can I finish my statement? I see I've gone over time, Your Honor, can I just finish the sentence? I'm sorry? Can I just finish my sentence? I see I've gone over time. Oh, yeah, absolutely. You finish your sentence, your answer to her question, and if you get other questions, you answer those too. Thank you, Judge. I would just direct the court to argument section three and the distinction it makes there. Thank you. Thank you, sir. Ms. Grace? Good morning, Your Honors. Catherine Grace on behalf of the appellant, Ms. Wilson-Elser. May it please the court, the Montreal Convention applies. It is really that simple. The Montreal Convention applies to international carriage of cargo by aircraft for reward. That's exactly what this is. The only reason that my client had a relationship with Mr. Terpening's client is because they had a contract for international carriage, transporting cargo from the United States to Switzerland, and that is key. I had a plan to talk about three things. I'm going to try to be a little more focused based on Your Honor's questions, but first and foremost, planets cannot recover from Planet Nine because of the application of Montreal. Article one makes very clear. That's what we need to be looking at. Article one. Is it international carriage? Is there transportation of cargo? Is it for reward? And is it by aircraft? One million percent. So we are within the world of Montreal. And why does that happen? Well, you're in the world by intent. You're right. That was the purpose of the contract. Yes, sir. The question really is, factually, was there an interruption by the interdiction by the government? Excellent question, Your Honor. And the answer is no. There was no interruption. And I will tell you why, Your Honor. The international travel necessitates involvement of customs. Whether we talk about customs paperwork, whether we talk about CBP, they are a necessary part of getting out of the United States. And that's what the Montreal Convention is addressing. And to your question also, Your Honor, there are provisions within Montreal that actually speak to the paperwork. They speak to customs. They speak to these issues that we're talking about, which makes the Montreal Convention, we're within those four walls, if you will. And if I could just step back for a moment, Your Honor, and talk about the history of the convention, the purpose of the convention. The purpose of the convention was to provide a uniform liability regime. There was a balancing effort to give passengers some idea of what their rights of recovery would be, but also to give the airlines some sense of exposure and limits of liability. It was giving all of the states, the parties to this treaty, some general sense, some uniformity and understanding of what they were to expect with international travel, Your Honor. And also very critical to this analysis, and we're really talking step one in terms of Article I, application of the convention, the international travel. Article 29 talks very clearly, and I'd like to read it to Your Honors if you wouldn't mind. Because it was a change from the Warsaw Convention. So in 1999, the effort of the drafters was to make this more clear that when we are dealing with the carriage of passengers, baggage and cargo, any action for damages, any action for damages, however founded, whether under the convention or in contract or in tort, negligence, excuse me, can only be brought subject to the conditions and such limits of liability as are set out in this convention without prejudice. Mr. Terpening wants to argue that the negligence occurred outside of international travel. That is incorrect, and I would urge Your Honors to consider the same case in that regard. Let me see if I can get that citation for Your Honors. But the same case is a Supreme Court case, U.S. Supreme Court case in 1999 that deals with a passenger who was stopped and searched before boarding. And so part of her argument was Montreal cannot apply because I haven't gotten onto the plane yet. It's sort of similar to saying, Planet Nine, you fill out some paperwork before we actually took off, before we actually got onto the plane. And I would urge Your Honors to consider the same case in that regard, U.S. Supreme Court binding law on this court to agree with me that the Montreal Convention must apply and that this is international carriage. The paperwork, I would like to point Your Honors to this factual point, which is also important. The paperwork was submitted the day of the flight. It was in effect in conjunction with the flight. It was in conjunction with international carriage, which is why, in fact, Montreal Convention must apply. And again, Your Honors, I'd like to point out the fact that the Montreal Convention is intended to design a uniform system for liability. And really what we're dealing with here is Article 18, as Mr. Terpening pointed out. There are really three provisions where they are trying to address liability. Can I ask you? Yes, ma'am. Just like how do we do our analysis question? At the beginning, you started by saying Article 1 is where we should be focusing because the Supreme Court has said Montreal Convention preempts everything within its scope. So whether a defendant would be liable under the convention or not, the claim is preempted if it's within the scope of the convention. So it seems like Article 1 is where we should be looking. But then in saying the court looked at the liability article itself, there it was 17, and said, well, some of these requirements have to be met to be within the scope, but some of them don't. Do we have to do that for Article 18? I was confused. I have to tell you, Your Honor, I find that the case law generally across the board can be very confusing. And I find that a lot of courts are actually conflating two issues. And this is exactly your point and your question. Number one, are we within the confines of the Montreal Convention? We have to answer that question. That is the threshold question, and that is Article 1. And it is as simple as saying the Montreal Convention applies to claims arising out of international carriage, your aircraft or reward, passengers, baggage, cargo. That's what we have here. So it applies. The next question becomes, can there be recovery within the scope of Montreal? That is a second layer. And, Your Honor, I just want to make it very clear. Let's draw the line here. The plaintiffs never asserted a claim under Montreal Convention, which is what the district court found. Because they didn't, and because Montreal Convention preempts every claim asserted by the plaintiffs, full stop, case dismissed. The court went further, again, to your point, Your Honor, in addressing, well, let's say they did assert it. Let's say we convert it. Let's say we perceive these voluminous claims to be a claim under Montreal. That's when we start talking about the liability provisions and that substantive scope, Your Honor, in terms of whether or not there can be recovery under Montreal. So what was the court doing and saying when they went to that liability provision? Were they using that to just understand what carriage of, I don't know, it wasn't carriage of cargo there. It was carriage of people. It was persons. That's correct, Your Honor. To understand what that means in Article 1? Your Honor, I believe what the Seng Court was trying to do was clarify what was confusing with the Warsaw Convention. Because at that time, we already had in 1998 the Senate adopting what Montreal would be. So Seng came out before Montreal was actually clarifying, if you will, Warsaw. I believe what the Seng Court was intending to do was to clarify, you can be within the Montreal Convention and have no recovery. And so for her, there was no accident. There was no physical injury. And so under Article 17, which we're not dealing with here, yes, you're within the convention, but you cannot have any recovery. So you're within the convention because we have international carriage, because we're transporting passengers, even though this was security. This was before boarding, which was an interesting point, very compelling to me, in convincing Your Honors that, again, we're still talking about international carriage, even though ultimately the plaintiffs have no avenue of recovery under Montreal. Does that answer your question, Your Honor? Yeah, yeah. It still seemed odd to me that the Supreme Court divided out, like there's no accident and these sorts of things. That's not required to show you're within the scope of the preemption. That's required for liability. But in the same article, they seem to suggest that, what was it, like, in the process of embarking or disembarking or all that, that seemed to be required to be considered within the scope, even though it was in a liability provision. I think a lot of the decisions that we're looking at conflate scope. So when we talk about Article 1, which I would really prefer to refer to as application, it is scope of application, but it's really does the convention apply? Right. Many of the cases seem to suggest you have to be liable under the convention for it to apply, which is not what the Supreme Court has said. Correct. That's going to be, it's like an end run and it is the wrong analysis. I've taken up a lot of your time. I think this is real interesting to talk about, but you probably have more pressing things you may want to tell the other judges about. What I'd like to do, again, just to bring it back to simplicity, the threshold question here, Your Honors, is whether or not the Montreal Convention applies. If the Montreal Convention applies, it's very clear that there is a preemptive effect on state law claims. The plaintiffs, the appellants here in this case, only have state law claims. They did not assert a claim under the Montreal Convention. Therefore, case dismissed. And the district court got it right. I very much appreciated the more full analysis because to the extent that there was a fairness argument to be made at the lower court, the issue is there still would be no recovery under Article 18 because of the public authority intervening. And CBP is very clearly a public authority. I don't think that there's any dispute about that fact. Some of the questions, Your Honors, asked opposing counsel with respect to, doesn't CBP have a right? And is there any proof that the reason CBP decided to inspect was in fact paperwork error? There's absolutely zero. And in fact, to the contrary, I know Your Honor was focused on a couple of things, one of which was the letter from the government, Seth Johnson, where he clearly talks about suspicious things. Also noted in that particular letter, by the way, was that one of the individuals on the plane was found to have personal use marijuana on him. The question about the bags, it's 58 military style duffel bags, but there's also 35 trash bags. I thought there was some trash bags involved. Yes, sir. There were 35. Both duffel bags and trash bags. That's exactly right, Your Honor. And in that complaint that the government filed, they also referred to, they're suggesting the word suspicious. I want to use the word suspicious, but what they did was they showed the photographs. They also talked about an issue in the West Coast that there was some observation. But did the fact there were trash bags make it seem like or appear to be illicit activity? Absolutely, Your Honor. That's exactly right. That would be an indication that it might have been marijuana. What is it is the question, right? It could be, who knows what it was. I mean, for me, it doesn't matter if they're packs of cards. The point is that CBP had the right to do what it did. And the event here that really triggered what the ultimate outcome was, which was destruction of a portion and then forfeiture of the other portion. Well, if it's international transportation, the customs people got a lot of power, don't they? That's exactly right, Your Honor. So the issue is the detention. When CBP decided, I am taking this, I am seizing this. That's really what we're talking about, which is why it's so important to remain focused on carriage by air. Mr. Chirping wanted to say, well, we're not really in air because the product was destroyed over there. Well, the convention makes clear that it doesn't matter really what the injuries are. What matters is that this is all stemming from international travel. And the convention makes clear that when the public authority intervenes in the transit of cargo, the air carrier cannot be responsible for damages under those circumstances. That is Article 18. And what is further compelling in my mind about why the plaintiffs can get no recovery here to have the most complete picture, although I feel like we've got 98% there, even if the convention did not apply and we were dealing with state law claims, we didn't do it. We didn't inspect. We didn't detain. We didn't seize. We didn't destroy. We didn't transport. We didn't do any of those things. I don't want to spend a lot of time talking about this, but the accusations about statutory obligations candidly don't make any sense to me. It is in fact the exporter or the shipper or the U.S. principal person in interest who has those obligations under statute. If in fact there are any statutory obligations on the air carrier, which there are, they're just not as characterized by my adversary, those are obligations to the government. They don't create a private right of action, so there isn't even a duty under those statutes. The appellants concede the fact that there's no contractual obligation by my client to do any paperwork. Frankly, my client didn't know how to do any of this paperwork. All they were hired to do was fly the plane. So in being hired to fly that plane internationally and performing any document, submission, any of those things, it all falls within the Montreal Convention. It is all international carriage. It is all for the purpose of transporting cargo. And the triggering event is when CBP, a public authority, opts to inspect, seize, detain, and later destroy. And for those reasons, Your Honor— How did it end up in California or something to be destroyed? I do not have a good answer for Your Honor. The record doesn't show that? I know that it went to the West Coast through the government because they were doing some additional testing. I think also, Your Honor— That'd be the responsibility of the customs? There was a lawsuit filed by the appellants seemingly almost agreeing with us that their first recourse, really their only recourse, was to talk to the government. Government, you did the wrong test. Government, give us our product back. And that is likely what triggered— Was that before it was destroyed? That was before it was destroyed. That is my understanding. I believe Mr. Terpenin can answer that question better. Let me say something else to you, Your Honor. There were about 3,300 pounds of product. About 2,700 pounds were deemed to be illegal. The balance was deemed to be legal. There was a forfeiture action with regard to the legal product that ultimately the appellants opted to abandon. There was a default judgment in favor of the government. So, there were two lawsuits— What was the forfeiture action predicated on? Why would it be forfeited if it's legal? The government was still in possession of the product. I understand. And, Your Honor, I'm not sure that I'm going to be able to answer specifically what the basis of that was. I'm not sure if it was a forfeiture action that wasn't opposed and it was forfeited. It was initially opposed. Right? So, there were two actions, the first of which was the action by the appellants against the government, essentially to get the drugs back. And the government ultimately prevailed in that case. That case was dismissed. The second case had to do with forfeiture of the hemp, the legal hemp. The legal aspect of it. Correct. And Mr. Terpening will tell you the reason that it was abandoned was because the product was no good anymore. It had been on the shelf too long and so its customer would no longer want it. I am not an expert in regular drugs, good drugs, illegal drugs, legal drugs. The point there- Was there a difference between what was in the trash bags and what was in the duffel bag? I don't have an answer to that, Your Honor, because I know the spot test was just a piece of one of those bags. I don't know if it was the duffel bag or the trash bag. There were just samples taken. Those tested positive for illegal drugs. Then it was sent out for more complete testing. It was 2,770.83 pounds that were illegal. And I want to make very clear, I only have three minutes here, I want to make very clear here- How many pounds? 2,700? Yes, Your Honor. A little more than a ton. And there was also about 500 pounds of hemp that was deemed to be legal, legal to transport. I want to make also very clear, Your Honor, that it's not Planet Nine's position that the product was drugs or not drugs. They don't know anything about that. What they know is they were hired to transport. What they know is this was international carriage. It was by air. What about the false invoice that there was no cargo? So the GENDEC- Who's responsible for that part of it? The GENDEC page prepared by my client did not say no cargo. They were cited for violating a statute with respect to that, but it had nothing to do with the seizure of the product. It had to do with incompletely preparing a document that was ultimately submitted. It did take that on, Your Honor. I do want to be clear about that, the GENDEC. But the USPPI, which is the US Principal Party in Interest, the appellants, the exporter, the shipper, they had the obligation and the ability to submit the electronic export information that was necessary. That was not done at all. So the EEI, that was another reason why they were in fact cited by the government in relation to this flight for failing to submit the EEI. The GENDEC page was one small piece to this. Yes. And did my client fill it out? Yes. Was it completely accurate? It was not. But that does not change the fact- Who was cited for that incorrect document? Our client was cited for, not specifically with respect to the GENDEC page, Your Honor. Thank you for the question. It is actually in the joint appendix as well. They were cited for failing to submit certain paperwork before flight. You said it was not completely accurate. It was completely inaccurate. I would not describe it as completely inaccurate, Your Honor. It said no cargo. As it did not say, Eric, it did not say no cargo. There are certain acronyms there that ultimately are translated by someone within the CBP that says this means X. But it is not as simple as a document that says, do you have any cargo? No. And in any event- I just wanted to clarify that the appellants were not cited for that error. They were cited, Your Honor. They were cited for other errors, but not for the document that they didn't fill out. They have no injury stemming from your client filling that form out incorrectly. Correct. Okay. That is correct, Your Honor. That is correct. And in sum, Your Honors, we would ask that you affirm and adopt the low reports decision, particularly with respect to the application of Montreal, and because it applies and preempts state law claims of which the appellants asserted. There are none here and the case should be dismissed. Did you all have an argument on this? We did not. Before- wait, let me finish the question. Before Judge Whitney. We did not. He had- he decided it on the paper. He did. Which is fine. I'm not being critical. We decide a lot of things. He did, Your Honor. On the paperwork here. I guarantee that. This was our first chance to talk about it today with Your Honors. Thank you so much. Before you sit down, I have a question for you. Yes, sir. That- I'm not putting- I don't put words in my mouth. I want to make sure how broad your argument is. Even if you- which you don't. Is it your argument that even if you conceded that what you didn't do correctly with the form and the declaration and the documents, even if you did it incorrectly and that incorrect documentation caused the seizure, that you would say Montreal still applied? Yes, Your Honor. And thank you for clarifying that I don't make any of those concessions because at the very best, I think Mr. Turpating can try to argue with no evidence to support that the document may have caused CBP to say, let's take a closer look. The seizure was because they determined that that product was illegal, which is why the proximate cause- I just want to make sure now, but now you put an ornamentation on it. I'm just saying, even if you concede that that error caused the seizure, I mean, whatever, and even if it was legal product, whatever, that Montreal still applies. That's correct, Your Honor. Thank you. Mr. Turpating? So one thing that I think we in the FOEs completely agree about, so I'd like to try to focus the court on it with the remaining time I have left, is that the most important threshold issue for the court to decide is whether the Montreal Convention applies. Well, that's why I asked the question as broad as I could. I think you already started with whether that- She said even if we conceded, you're right, that it had nothing to do with the picture being- It had all to do with that the picture was seen, the documents were wrong, and that was a seizure, that Montreal still applies. And so I want to focus- Do you disagree on that point? Our whole case is that the Montreal Convention does not apply here. That's what I understand. And that's why we didn't bring claims under the Montreal Convention. And there I would focus the court on the language of Article 18 itself. And you're trying to pursue state law claims. Yes, sir. You're right that the Montreal Convention applies, but the state law claims need to be dismissed. That's correct. That's why this is the central predicate issue in the case. And I would focus the court on Article 18 and its actual language, which broadly covers events that occurred during carriage-by-air. But it limits it to the carriage-by-air has to take place in the performance of a contract for carriage-by-air for the purpose of loading, delivery, or transshipment. Okay? And there's case law that says that if it doesn't occur during that category of language, the Montreal Convention doesn't apply. So it's not the case that just because the Montreal Convention applies at some point in the journey, the Montreal Convention doesn't apply. And I would point out that Planet Nine's cases and the cases that Judge Whitney  to try to pull what happened when this hemp was in San Francisco. And by the way, Your Honor, we know it's San Francisco because of Joint Appendix 899, which shows where the tests were conducted. But the cases that the court at the trial level tried to use to pull us back into the Montreal Convention, best value in Lufthansa, were cases where clearly the airline or the carrier- What does San Francisco have to do? Suppose they only took it to another county in North Carolina. Would that make a difference? It wouldn't make a difference at all. The point is, every case- When you're acting over San Francisco, this is irrelevant, right? Well, it underscores how far outside of the Charlotte Airport it was. That's the only reason it's relevant, Your Honor. You're right, it could be- But you're saying the distance, that distance make a difference in terms of the application of whether or not Montreal applied? No, the only reason that's important, Your Honor, is because it underscores  near the Charlotte Airport when the act of destruction occurred. And it was definitely not in Planet Nine's custody when it occurred. This was not a routine- But the convention doesn't say the destruction occurred during carriage by air. It says the event that caused the destruction. You're arguing about where the destruction occurred, but we were talking about proximate cause, I thought. Well, even that doesn't occur during carriage by air, as our brief says, because that occurred when the paperwork was submitted or not submitted, which didn't occur on the day of the journey. It occurred days before the journey. Part of the stuff was destroyed because you all agreed to the forfeiture. Well, we consented to the forfeiture for many months and a long period of time until it was rotten. And my client, who doesn't have a ton of money, said, don't do it anymore. I mean, there was no point in fighting that forfeiture after months, because hemp is a crop that was literally rotten at that point and worthless. And my client has limited financial resources to pursue worthless crops. And that's why we're, that's why we agreed to the forfeiture there. But I believe I'm out of time. The court doesn't have any other questions. And I thank you very much. We appreciate your work. Thanks for being here. And we'll come down in Greek Council and then we'll proceed to our final take.
judges: Robert B. King, Roger L. Gregory, Allison J. Rushing